And I'm pleased to represent the appellants in this case, Jerry and Sun Nam Sun. We believe that the central issue, although we have briefed several issues in this case, is whether or not the Suns should pay tax on money they acquired from Mr. Chung that was subject to an agreement to repay. Let me ask you, what's the source of all this money Mr. Chung is sending here from China? He testified at trial that he was worth $100 million and that he had $20 million of investable funds. Beyond that, there's no indication of source. He's in the shipping business. He brokers ships. He hires the ships, and Mr. Sun would pay him to transport goods overseas. And there was testimony about that because they were searching for some reason it would be income or did they have a business relationship. That was the government's position that it was too good to be true, that this money would just come over to be invested. So they were searching to find a business relationship, not finding any because although they did do business with each other, that was not the source of the funds. Was there ever an allegation of money laundering? No, Your Honor. Let me ask you this. I give $10,000 to a financial advisor, and I say, I don't want to deal with all this investment stuff. You find something to do with my money, invest it somewhere. Instead, he goes to Vegas and loses it all. Is that taxable for the investment advisor? There was a case very similar to that. It was the Walters case, and the holding was that there was no consensual agreement to repay the funds, and in that case it was income. But here the court found credible testimony that when at the time those funds were exchanged, there was an obligation and an intent to have a consensual agreement to repay. But if I give money to my broker or financial advisor, he's obligated to repay, maybe not exactly what I gave him, but whatever the investments earn or lose. I get my money back if I want it, right? Well, not necessarily. I don't know any financial planner that will give a money-back guarantee. No, with gain or loss. That's what I'm saying. Whatever turns out with my money, if I double my money, if I lose 70 percent of it, eventually that has to be repaid to me, whatever profits or losses I get, right? I think that is different. That that is different from a hard and fast agreement to repay. This Court in Moore v. Commissioner said that, and this is quoted in our briefs, said that it had to be a hard and fast agreement to repay, an obligor and an obligee. And that is different from a financial planner who simply either loses the money because he's a poor investment advisor. That's not income to the financial planner because he didn't invest the money. But in your case, if he took it and swindled it, and there are cases like that, the courts have held that is not a consensual agreement to repay. Let me ask you this. Let's say Bernie Madoff takes the money from someone and says, I'm going to repay this plus 10 percent, and he blows it on the yacht or whatever. Is that taxable to him? Your Honor, there is a distinction in the Bernie Madoff case or any financial planner. And, again, it gets back to the consensual agreement. I'm saying assume one. Okay, assume one. We had a case like that, Rochelle v. Commissioner. It's cited in our briefs, and it's a Fifth Circuit case. And in that case, the court drew the line between a false promise and a real promise. And here the tax court found credible testimony that these gentlemen had an agreement to repay the funds. And that's different from false promises. I mean, in the record, what indicated that was a credible, a genuine promise? The court's holding? What, in the record? Yeah. The fact that Mr. Chung gave instructions to Mr. Son that he could do whatever he wanted with the money, spend or invest it, all he cared about was the return. That's not what your client said. I was going to give him 10 percent back, and then above that we'd split any profits. And so according to that, your client would have had to account for whether the money was earning, you know, was profiting or losing investment income. And there was no evidence that any of that was done. So how is what happened consistent with your client's characterization of the arrangement? I think that their two testimonies are entirely consistent. They both testified that Mr. Chung gave Mr. Son the money to invest primarily. Mr. Son's testimony — But what did Chung say the terms was? He didn't say there was this 10 percent back plus profit sharing after that. Mr. Chung never said there was a 50-50 split. That was only Mr. Son's testimony. What Mr. Chung did say is that there was a guaranteed 10 percent per annum. The tax court's opinion casts some doubt on that because it says it wasn't clear whether it was 10 percent per year or a cumulative 10 percent at the end of the 10-year period. Mr. Chung cleared that up at trial on testimony, and that's the trial transcript, page 193 through 199. He was asked several times to clarify that issue. And they even gave him an example. If you have $100 invested and you get — do you get back 110 every — the 10 every year, or do you get 110 at the end of 10 years? And he said, no, not that. There was absolutely no question it was 10 percent annually. If you're right that it's not misappropriation, what is it? I mean, it's got to be something. It's got to be categorized somehow. How would you categorize it? You tried to say it was a loan. Is that — are you still standing by that? Well, to answer the first question, the Court never defined misappropriation the way that it's defined in Texas. I know that, but what are you saying it is? I know you're saying it's not misappropriation. All right. What I'm saying it is, is using money or property that you have that is contrary to the agreement under which you hold it. And we're saying under that definition, there is no misappropriation. Well, I know that. So what is it? You're saying it's not misappropriation. How would you classify these funds as a loan? Is that your position? No, Your Honor. It's got to be something is my point. What it was — You don't want it to be a gift because a gift's taxable, even though a lot of what Chung's saying, I don't care what he did with it, he could go gamble it all away. I mean, a lot of that seems consistent with the gift, but that has tax consequences. So what are you saying it is? Well, actually, on the gift, the Court held it was not a gift. Right. Because of the intent to repay. Right. A tax — a gift would not be taxable to Mr. Sun. The — a gift is only taxable — Well, but they had to have the foreign — Mr. Chung would have had to file the foreign gift. Mr. Sun would have had to file the foreign — it's just a two-page report that records the receipt, but it's — there's no tax due with it. So is that your position, that it was a gift? No. We are — it's our position that it was a business arrangement between two men and business partners and friends who trusted each other, and Mr. Chung respected Mr. Sun's investment abilities. And unfortunately, they had an oral agreement. We would not be here if they had had this all in writing. None of that would have seemed to good to the truth. So it was held in trust, you're admitting that? No, Your Honor. We — He just said it was entrusted to him. The word entrusted does not necessarily imply trust. In the case of Indianapolis v. Commissioner, the Supreme Court in 1990 held that the light company's customers entrusted their funds to the light company. These were deposits against their utility bills. And despite that word entrusted, the Supreme Court said that despite the utility company's unfettered use and control, and that's an exact quote, unfettered use and control, they put the money in their general account, paid their bills with it. But the reason it was not taxable to Indianapolis Power & Light is because they had a consensual agreement to repay the customer either when they asked for the money back on termination of service or they applied it to future utility bills. And I'm saying that what Mr. Sun and Mr. Chung had in terms of unfettered use and control is no different than Indianapolis Power & Light. But doesn't the record indicate, though, after — they may have had this agreement in the beginning, but from Sun's standpoint, what is there in the record that indicates that he honestly intended to keep that promise? I mean, he co-mingled the money. What he didn't spend, he co-mingled and took it to Vegas and lost it. I mean, how could you conclude from the record that he honestly intended to pay it back? There is testimony that he told Mr. Chung about his personal use at the time and that Mr. Chung did not care. Mr. Chung said he told him he went gambling and lost money in Vegas, but he didn't say it was Chung money he lost. That's what I got out of it. Well, the record shows in the general ledger for MNCCM, the corporation that was used as sort of a conduit, that Mr. Chung's money came in and then it went out to Mr. Sun. And some of those were transfers directly to Wynn, which is a gambling house. There were transfers back from Wynn. The net effect was about $2 million, and Mr. Chung knew about it. He said it was a small amount of money. And, frankly, Mr. Chung was financially indifferent to how Mr. Sun spent this money. His primary concern should be the solvency of Mr. Sun because Mr. Sun testified that he was worth $40 million and could liquidate his holdings in a week and pay Mr. Chung what he owed him. So why did he tell him to invest it? And as long as he got his money back with 10 percent, that would be the end of it. Why does he care if he invests it? Why does Sun say he had to give a profit, split profits above 10 percent? I mean, it's just the stories aren't consistent. No doubt if he just said, I'm loaning you money and pay me back 10 percent per annum, that's a loan. But there's this investment component to it. Judge Costa, I think it makes sense that if Mr. Sun is getting $20 million and he's got the monkey on his back to pay it all back plus 10 percent per annum, it makes very good sense that he will invest it. That's a heck of a monkey to have. And he did, in fact. But keep in mind that Mr. Sun's testimony was that he viewed it as a joint investment. And because of the 50-50 profit split, this is just like the facts in NARD versus Commissioner, which we also cited in our reply brief. In NARD, the partner advanced money out of the partnership, built his home with it. Everybody knew about it. It was meticulously tracked in the ledger, just like Mr. Sun did. And the Court held it was not income because there was a consensual agreement to repay it. They were partners in this, in one sense. You asked me how I would characterize it. I might characterize it. If I didn't characterize it as a contract, I would characterize it as a general partnership. You haven't mentioned the argument that it was abuse of discretion for the IRS to be concerned. What's your position on that? Your Honor, I think our stronger position is the jurisdiction. The abuse of discretion on the fact that no one argued this theory below. But 6214, that statute, you didn't challenge the increased efficiency on that ground below, right? No, Your Honor. You didn't, the ad or before ad? We did not raise jurisdiction to the, well, we didn't, to the tax court. But my understanding of the law is you can raise jurisdiction at any point, frankly. Well, certain types of jurisdiction, subject matter jurisdiction. There's other types, personal. A lot of jurisdiction is waivable. So my question is, is this the type of jurisdictional argument that's waivable or not? Do you have any authority on that? Your Honor, I don't think jurisdiction is waivable. From my general understanding as a tax lawyer, jurisdiction can be raised at any time. And if it's, if the tax court does not have jurisdiction, it will not take the case. We've had cases like that where we've raised jurisdiction at the last minute, and that's the end. If I may continue, there's one case I would like to bring to the Court's attention, and that is Webb v. Commissioner. This was a case that both the tax court and the government, well, all of the briefing and the tax court relied on Webb v. Commissioner. This was a court of appeals in the First Circuit. And the reason I think this case is important, it's not only because it's one of the main cases that the tax court relied on to find income here. And keep in mind what the tax court found. It found that Sons' personal unrestricted use of the funds constituted misappropriation, which constituted income. So that was their logic. Unrestricted use equal misappropriation equal income. And I believe if you read the Webb case, you will find a remarkable similarity to the tax court's logic and the court of appeals rationale with one critical difference, and that is the outcome of the case. And I think it also explains why we have a trust in the middle of this relationship, and I think it also explains where the tax court made an error of law. Thank you. You have some rebuttal time. Your red light's on. Okay. Sorry. Thank you. May it please the court. Jeff Klimas for the Commissioner of Internal Revenue. The primary issue raised in this appeal is whether the factual record below in the tax court supported the finding of misappropriation. The Supreme Court in James and this court in Rochelle have indicated that the essential test for misappropriation is whether the taxpayer treated the funds as his own, whether the taxpayer exercised dominion over the funds, whether the taxpayer received an economic benefit from the funds. The factual record in the tax court clearly supports such a finding here, where Mr. Sun took funds belonging to Mr. Chung and used them for gambling, used them to gift the money away, used it to pay his mortgage or to buy a car for his personal use. He used the funds to secure a loan for his closely held business. He held the funds in his own name, commingled the funds, and reported either the earnings on those funds or, in some cases, the funds themselves as his funds on tax returns or associated filings. The taxpayers alternately contend either that a finding of misappropriation was inappropriate because, on one hand, they argue that Mr. Sun was never obligated to invest a single penny of Mr. Chung's funds, that he had complete discretion to do whatever he wanted with those funds, or, on the other hand, they argue that Mr. Sun always intended to restore or repay the funds and recognize an obligation to do so. But neither of those arguments are availing here. With respect to the former obligation, there is adequate factual support in the record that these funds were earmarked for the specific purpose of investment. Mr. Sun testified that he was entrusted with his friend's funds for investment. Entrust, that's Mr. Sun's word. In the taxpayers' post-trial brief at docket 33, the taxpayers argued that Mr. Sun was entrusted with funds belonging to another for the purpose of investment, much like a custodian. Mr. Chung, for his part, was questioned at trial about whether he asked Mr. Sun to invest all the funds that he provided. He answered in the affirmative. To the extent that there's any contrary indications in the record, in terms of Mr. Sun having broad discretion about how to use the funds, certainly the tax court was well positioned and uniquely qualified to draw the inferences and determine what actually carried the day. And here it found that the testimony that these funds were entrusted for the specific purpose of investment was credible and made a conclusion that was not legally erroneous, was not clearly erroneous. What do you do with the finding that there was a consensual agreement to repay the money? Yes, Your Honor. This court in Moore considered a similar situation. In that case, this court held that a taxpayer's intent to repay funds, even a sincere intent, did not preclude a finding of misappropriation when the taxpayer acted inconsistently with the agreement that he entered into or prejudiced the party who provided the funds. In Moore, the situation was the taxpayer went to a series of lenders and attempted to secure loans conditioned on the promise that he would use the loan proceeds to purchase industrial tanks to store ammonia. Those tanks would then serve as collateral to secure the loans. The taxpayer adamantly testified that he intended to repay the loans, even though he had not purchased the tanks that would serve as collateral. He testified that he intended to repay those loans and, in fact, had taken steps to begin doing so. He had made all the payments of principal, interest, all the bonus payments that were due under the loan. This court nonetheless found that it was appropriate to find misappropriation because a sincere intent contradicted by evidence showing that there was not an intent, that the mere expression of intent is not sufficient to carry the day. Did the tax court here make those findings, though? The tax court found that the funds were entrusted for a specific purpose. I know they made the findings that they were entrusted for investment and used for other purposes. Did it make a finding that there was a lack of sincerity as to the obligation to repay? The tax court made findings that the funds were used for a purpose inconsistent with repaying the funds and inconsistent with the agreement that the funds would be invested, that Mr. Chung was prejudiced by virtue of the fact that the funds were not being used to create any kind of a return, that that was the entire purpose of the agreement was to try to secure a return, and Mr. Chung's return on that investment depended on the use of the funds. He was certainly prejudiced when those funds were not invested and, in some cases, completely eliminated. They were spent or gambled away. Similarly, the Seventh Circuit — What does that do with the obligation to repay requirement that James has? The fact is, in Moore, the Court indicated that a sincere expression of intent to repay is something that many embezzlers, many swindlers would have, but when a taxpayer acts inconsistently with that intent, that is not dispositive. So it's fine that Mr. Sun testified and testified repeatedly, oh, I intend to pay the funds, but that does not constitute a consensual obligation to repay when he acts inconsistently with those statements. It's similar— No, he didn't have the intent to repay it. It's a factual finding that the Court made based on what he had done with the funds. The tax court found he had no intent to repay? I didn't see that. The tax court did not make a specific finding to say he intended or did not intend, but it did say that his use of the funds was inconsistent with using them for investment, was inconsistent with using them for the purpose of investment, as agreed upon by the parties. Was there testimony that he didn't have any other funds that he could use to repay? No, Your Honor. Mr. Sun did testify that he had sufficient funds to cover the principle and apparently a 10 percent return on the funds, but that does nothing to eliminate Mr. Chung's prejudice by having the funds not invested at all or not being invested on his behalf. There's no way for him to unwind the clock and say 5 years from now, well, you got your money back, but in the intervening 5 years, there was no return earned on your investment or maybe a negative 100 percent return earned on your investment. He was prejudiced by the fact that Mr. Sun did not honor his end of the agreement. And did the district court abuse its discretion when it increased the claim without giving notice to Mr. Sun? No, Your Honor. And just to make sure, I'm sorry? What are we supposed to do with that? Are we supposed to send it back and say, okay, now you have notice, now you can litigate it? Well, Your Honor, as a threshold issue, we think that the taxpayers chose the wrong vehicle to challenge the increase. They claim that they're challenging the increase in the deficiency, but what they're really trying to do is to argue a 161 motion to reconsider or for a newer further trial that they never actually submitted. They're really trying to use their opposition to the commissioner's motion to amend, not to challenge the calculations, not to increase the deficiencies, but they're really trying to use it to challenge the underlying holdings by the tax court on a misappropriation theory. They had an absolute right, following the issues of the opinion, to move for reconsideration or for a newer further trial, at which point they could have introduced additional arguments or additional evidence. They could have even sought leave of the tax court to file such a motion after the court allowed the commissioner to file an amended answer increasing the deficiency. And so we think that they're ill-positioned, having failed to file such a motion, to now complain that they were somehow prejudiced by not being able to introduce additional evidence or arguments. Because they didn't ask for it? Correct. Because they didn't ask for it. Furthermore, we would submit that the adjusted calculations, and again, these are only adjusted calculations. This is not introduction of any new legal evidence. The only purpose of the amended answer was to increase the amount that was owed. The increased amounts were consistent with the alternative theory that was set forth in the IRS's notice of deficiency, that the funds that were transferred from Mr. Chung to Mr. Sun were his ordinary income. The commissioner's primary theory was that these were first ordinary income to MNCHM, Mr. Sun's closely held corporation, and then were considered to be dividend income when they were distributed to Mr. Sun. But the commissioner's notice of deficiency set forth an alternative theory, which was that we should ignore the transfer to MNCHM and treat these as the direct ordinary income of Mr. Sun. It's also consistent with the position that the taxpayers took in their post-trial brief. At docket 33, where they repeatedly argued that MNCHM served merely as a conduit, that it should not have any tax consequences on its own for receipt of these funds, that MNCHM was merely a conduit for passing the funds to Mr. Sun and they should be taxable to Mr. Sun directly or not at all. We would note, just for clarification, this case was tried on a consolidated basis with Mr. Sun's closely held corporation, MNCHM, as well as with the individual taxpayers, Mr. Sun and his wife. Although the amount increased for Mr. Sun and his wife by a little over a million dollars, if you look at the total tax and penalties, it should be noted that the tax consequences that the taxes owed and the penalties owed by MNCHM decreased dramatically as a result of the court's opinion because they were no longer being taxed for receipt of ordinary income. So it ended up being a net $7 million decrease when considering this on an aggregate basis. We would submit that the evidence fully supported the court's finding of misappropriation and that the taxpayers have not put forth any credible arguments as to what evidence they were precluded from introducing, what evidence or arguments they should have been allowed to submit. They have somewhat evolving theories of how they were prejudiced by not being able to present evidence at trial. In the tax court below, they argued at Docket 56 that perhaps they would have offered expert testimony regarding the law of misappropriation, would have offered expert testimony regarding the law of trusts, that they might have called Mr. Chung's business associates as witnesses. Now, here in the reply brief on appeal, they're arguing maybe they would have called Mr. Sun's friends or associates as character witnesses. Maybe they would have brought in financial experts to offer expert testimony. Perhaps they would have brought in Mr. Sun's bankers or investment advisors or business colleagues to testify. But none of those facts that they're saying that they were precluded from introducing or should have been allowed to introduce go to the core issue in this case, which is what was the agreement between Mr. Sun and Mr. Chung and what did Mr. Sun ultimately do with the funds that he got from Mr. Chung, and was that consistent or inconsistent with the terms under which he acquired those funds. On their argument, did the tax court make a finding that Chung did not give unrestricted use of these funds to Sun? What the tax court found is that the funds were specifically earmarked for investment, but that Mr. Sun was allowed broad latitude and discretion in how he invested the funds. That was the way that it resolved any inconsistency between the testimony  and the fact that there weren't any restrictions or additional restrictions placed on the funds. Do you agree that if there was a consensual agreement, a sincere agreement to repay the funds, then the money that Sun used would not be taxable to him? That's correct. If Mr. Sun and Mr. Chung had— Do you agree that that's the law? That's correct. If they had sat down and agreed that Mr. Sun could do whatever he wanted with the money and simply had an obligation to return the funds at the end of the day, that would not constitute misappropriation. So the distinguishing factor is that there was a commitment to make investments. Is that what you're saying? That's correct, that there was an agreement that the money would actually be used for one particular purpose, and Mr. Sun decided to use it for a different purpose that was inconsistent with the agreement, according to the factual findings of the tax court. On the jurisdictional issue, this Section 6214, that the increased deficiency has to be before or at the hearing, can you point to any cases where the deficiency was increased at this juncture, or I guess what everyone's calling the computation stage of the proceeding when there was no further hearing? Yes, Your Honor. In fact, this Court's decision in W.H. Armstead involved a very similar situation. In the W.H. Armstead case that was decided by this Court, there was a similar situation where there was a consolidated tax court proceeding involving a corporate taxpayer as well as individual taxpayers. There were adjustments, there were factual findings that the tax court made during the course of the trial that ended up adjusting the treatment of certain items reported by the corporation. Those had a flow-through effect to how those transactions were treated on the returns of the individual taxpayers who were also parties to the case. After the opinion was issued, during the computations phase, the commissioner moved to amend his answer to assert an increased deficiency to conform to the proof produced at trial and the findings made by the tax court. The tax court found that it had jurisdiction and discretion to allow it and did so, and this Court affirmed that decision. So we think that in terms of the Statute 6214, it's a purely temporal test, whether or not the request for an increase is made at or before the hearing or rehearing. The term hearing, as interpreted by every court to address this issue, which includes the Third, Fourth, Sixth, Seventh, Tenth Circuits as well as the tax court and as well as this Court implicitly in the Ormston case, has held that hearing should be accorded a broad meaning consisting with not only the trial but also the computations phase and the entry of the decision. And that's consistent with the well-established principle that a hearing in equity embraces the decision as well. Taxpayers have not identified any authority. It can basically be raised whenever, according to your reading of that case law, any time through final judgment. That's correct, Your Honor, that as long as the taxpayer has the opportunity to respond, then the IRS, the commissioner, could raise the issue at any time up until the final decision was entered. The statute was enacted out of a concern that tax courts were — tax court judges were sua sponte, unilaterally increasing deficiencies. And so this was meant to force the commissioner to actually request such an increased deficiency so that the taxpayer could respond and determine whether there was any prejudice and make any arguments that they wanted to make. And that is consistent with what happened here, where the commissioner moved to increase the deficiency to conform to the facts and findings made by the tax court. The taxpayer was given the opportunity to respond, and then the court ruled allowing the deficiency to increase. But there was no response. I'm sorry, Your Honor? They were given the opportunity to respond, but you said they didn't put any — Your Honor, they did respond. They opposed the motion, but the court ultimately — they opposed the motion on a number of grounds, some of which are not raised here. They argued that the motion was untimely or prejudicial. But they weren't allowed to present any evidence. Well, that would not have been the opportunity to present evidence. If they wanted to present evidence, they had an opportunity to file a motion for reconsideration or for a new or further trial under Rule 161. The motion to amend was merely a matter of computations and calculations, which the taxpayers concede are correct based on the opinion that was issued by the tax court. The issue of additional — They could have challenged the new computation if they wanted to. Oh, absolutely. They agree the numbers add up, but they could have challenged — you're saying that's what — all that was at issue with the increased deficiency notice. That's correct, Your Honor. This was, in fact, an agreed computation. Once the motion to amend the commissioner's answer was granted, the parties agreed that the calculations that were submitted by the commissioner were correct. They jointly said these are the correct computations based on the tax court's opinion. So there wasn't any issue as far as them needing to introduce additional evidence in terms of the calculations or computations, which was what that motion dealt with. And, again, if they wanted to introduce additional evidence, they were certainly free to do so under Rule 161. They could have done that immediately following the court's opinion. Or if they wanted to, they could have sought leave from the tax court to file such a motion even after the tax court said, yes, we're going to go ahead and allow the increased deficiency. They didn't do so, and now they're in a very ill position to complain that they weren't able to introduce evidence or arguments that they, in fact, never tried to make to the tax court. If there's nothing further. One thing. You know, and I agree that Chung gave the money to Sun for investment, but then when he used it for his own purpose, Chung didn't object to it. In fact, he said it was okay. So how does—I mean, doesn't that sound like he's approving of that and giving him discretion to use the money for what he wants to? Well, Your Honor, certainly we don't think that the record supports the finding that Mr. Chung was fully aware of what was going on with the funds. For example, Mr. Chung said, I don't think that— he said that in terms of the funds that were not used for the purpose of investment, he said that wasn't much money. In fact, it was 100% of the money that was not used to invest on Mr. Chung's behalf. He likewise said, I know that Mr. Sun gambled, but I don't know if he was gambling his own money or maybe my money. So without the opportunity for full and contemporaneous disclosure, which is what the taxpayers have pointed to in the NARD case, we don't view that as being consent, nor was there any evidence that there was a modification to the agreement that said, okay, we understand that, you know, you didn't invest some amount of funds, but you're not going to be required to going forward. There was no renegotiation of the agreement. There was simply an acknowledgment that some, apparently what Mr. Chung thought was a small amount, had not been used for the purpose that they agreed upon. And the fact that he after the fact did not object does not change the terms of the agreement that they entered into in their first instance. Is it critical to your position that we agree with the tax court that this was a trust that was created? No, Your Honor. Taxpayers have identified no authority that has ever said that a finding of the existence of a trust is a prerequisite to finding a misappropriation. In fact, in the Moore case, this court made a finding of misappropriation without any preliminary finding that a trust existed. We do think that there's special support for the existence of a trust, but it's not a legal prerequisite to finding misappropriation. If the court has nothing further, we request that the tax court decision be affirmed. All right. Thank you. Ms. Cantrell, did Son ever tender the repayment of the $19 million plus interest? Your Honor, there's nothing in the record, but to answer your question, he has since paid back $2.5 million to Mr. Chung. He did in 2014 and 2015. And Mr. Son testified that as he would sell assets, he would repay portions of the money. And he's done so, but, again, that's not in the record. I just know that. Thank you. You'd be able to deduct that if the misappropriation theory sticks and he ends up paying it all back, he can deduct that in the years he pays it back. That is what James held. And I think part of the problem is that we are getting away from the fundamental principle of law that James set out, which is that there is a two-prong test for income, and you have to meet both prongs before there is income. What the government is asking you to do is to hold that the unrestricted use alone, whether it constitutes misappropriation or not, is the only prong that's important. They're asking you to ignore the agreement to repay, which the tax court found that both men credibly testified that there was an agreement to repay. And that is contrary, directly contrary, to the James case. In fact, James says misappropriation is the beginning of the inquiry, not the end, because it says that whether earnings are acquired lawfully or unlawfully, there is a two-prong test that we have to meet. You know, to me, James is, as you know, an appeal from a criminal conviction for willful failure to pay taxes. And the bottom line I get out of that case was that the evidence was insufficient to show that it was willful because of the confusion in the law. I mean, to me, the rest of it's dicta. Your Honor, the Supreme Court was resolving a conflict between whether we should treat taxpayers who have acquired funds lawfully from those who are law-abiding citizens, I mean, from, in other words, law-abiding citizens versus criminals. Should we let the criminals off the hook because they had a legal obligation to repay? And just as the Supreme Court, the entire holding is about we're not going to treat them any differently. We're going to treat them the same if they pass the two-prong test. I mean, the holding was because it was a criminal case, they couldn't show willful failure to pay tax. Your Honor, I think that is really — I mean, there's a lot of language. I agree with you, but I don't know really how much weight we ought to give to it. Your Honor, it's been cited over and over and over. The three cases that the tax court cited in support of its opinion referred to James. The four cases that the government cited in its briefs all referred to James. James is quoted over and over and over, over 400 times. It is the fundamental principle. I think it squarely controls the outcome of this case. Let me discuss your jurisdictional argument and then your argument that they shouldn't have been given leave to amend the answer. Your arguments about that seem to say we should throw out the whole case because your client didn't know about this misappropriation theory. It didn't have notice. You say where a party fails to raise a theory and a notice of deficiency, a court should not consider that theory. So why are you only challenging the increase in the deficiency and not saying, because the answer didn't sufficiently allege this misappropriation theory, the whole thing should get thrown out? I think I understand your question is if misappropriation is not the test, why are we asking for it to be? Well, if you didn't have notice of misappropriation, which you're saying, you're saying that's where the deficiency is. Right, Your Honor. But why aren't you asking to throw out the whole trial because it was the whole decision was based on a theory that was never alleged and you never had notice of? It just seems your argument on prejudice doesn't seem to go so much to the increased deficiency as to saying the whole thing was unfair and improper. As it turns out, Your Honor, I think we had ample evidence to prove that there's no income because of the obligation to repay under the two-prong test in James. If and obviously the tax court did not subscribe to the James theory, it didn't even cite James. I think if we had known misappropriation was an issue, we could have put on more evidence. As it turns out, I think we had ample evidence. But if this court doesn't believe that James controls the outcome of this case, then I think we would like an opportunity to try the issue that we are appealing. What seems odd to me, if you just let's say we affirm on the liability of the tax court, but then we agree with you that there was no jurisdiction to increase the deficiency. So your client's left with a tax bill that was based on a dividend theory with different rates? I mean, it just seems like such an odd situation. Your Honor, to answer that question and also comment on something that Mr. Klimas said in his argument, is that the government's motion to amend was not based on their alternative theory as they say it was. Because if you look at the tax difference between the tax on the misappropriation and their alternative theory, they're different numbers. We agreed on the computation because under Rule 155, you can't challenge it. You're supposed to agree on the computation that relates to the findings of the court. They were what they were. But the tax court rejected their alternative theory. All right. That's why I'm saying you'd have this tax based on the dividend theory that's at odds with what the court found. So in other words, if you found that James did not apply and that misappropriation is a loan to constitute taxable income, maybe I'm misunderstanding your question. It's all right. Would it need to be remanded to the tax court? No, Your Honor. We don't believe it should. Okay. Let's see. My time is up. Thank you. All right. This has been so exciting. We're going to take a ten minute break.